

**FILED**

FEB 18 2014

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

MORF

POSTED ON WEBSITE

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re )  Case Number 12-17745-B-13 ✓

)  DC No. DMG-4

F. Oliver Bondswell Cooper, )

Debtor. )

Kathy Watson, Trustee of
James S. Moore Trust,

Claimant.

In re )  Adversary Proceeding No. 13-1068

F. Oliver Bondswell Cooper, )

Plaintiff, )

v. )

Kathy Louise Watson, Trustee )
of the James S. Moore Family )
Trust dated January 27, 1999, )

Defendant. )

**MEMORANDUM DECISION REGARDING OBJECTION TO
CLAIM AND COMPLAINT FOR DECLARATORY RELIEF**

D. Max Gardner, Esq., of The Law Offices of Young Wooldridge, LLP, appeared on
behalf of the debtor/plaintiff, F. Oliver Bondswell Cooper.

Andrew K. Sheffield, Esq., of the Law Offices of LeBeau & Thelen, LLP, appeared on
behalf of the creditor/defendant, Kathy Louise Watson, Trustee of the James S. Moore
Family Trust dated January 27, 1999.

1    Before the court are two related matters brought by the debtor, F. Oliver

2  Bondswell Cooper ("Cooper"). The first is Cooper's objection to a proof of claim filed

3  by Kathy Louise Watson in her capacity as trustee of the James S. Moore Family Trust

4  dated January 27, 1999 ("Watson"). The second is an adversary proceeding filed against

5  Watson for declaratory relief based on the same facts and circumstances. Watson's claim

6  is secured by a deed of trust against Cooper's residence and the adjoining property. The

7  underlying obligation originated 18 years ago. Cooper now disputes Watson's calculation

8  of the balance due and seeks a determination that the underlying obligation was modified

9  and partially forgiven in the settlement of a contested matter in a prior bankruptcy case.

10  The parties differ on their calculations by more than $55,000.[1] Neither party has a

11  complete record of the payments that have been made on the underlying obligation and

12  both are essentially asking the court to adjudicate a number which fixes the amount that

13  Cooper owed at the commencement of this case. The court has considered the arguments

14  of the parties, all of the admissible evidence, and reviewed the entire trial transcript. For

15  the reasons set forth below, Cooper's claim objection will be overruled and a declaratory

16  judgment will be entered for Watson in the adversary proceeding fixing her claim in the

17  amount of $92,484.49.

18    This Memorandum Decision contains the court's findings of fact and conclusions

19  of law required by Federal Rules of Civil Procedure 9014(c) and 52(a), made applicable

20  to this contested matter and the adversary proceeding by Federal Rule of Bankruptcy

21  Procedure 7052. The court has jurisdiction over this matter under 28 U.S.C. § 1334, 11

22  U.S.C. § 502 [2] and General Orders 182 and 330 of the U.S. District Court for the Eastern

---

24    [1] In closing argument, Watson's attorney stipulated to reduce her claim to $92,484.49.
25  Cooper's attorney stated his prayer that the claim be allowed in the amount of $36,958.41.

26    [2] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy
27  Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-
9036, as enacted and promulgated *after* October 17, 2005, the effective date of The Bankruptcy
28  Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat.

1  District of California.  This is a core proceeding as defined in 28 U.S.C.
2  §§ 157(b)(2)(A)(B) & (O).

3      **Procedural Background.**  This dispute began with the filing of an objection to
4  Watson's proof of secured claim.  Cooper disputes Watson's accounting of payments that
5  have been made and her calculation of the balance owed on the underlying promissory
6  note.  Cooper contends that Watson failed to give him credit for all of the payments he
7  has made (the "Claim Objection").  In early proceedings, Cooper also argued that the
8  obligation to Watson had been partially modified and forgiven in the course of a prior
9  bankruptcy proceeding.  Watson's accounting did not give credit for that transaction.
10  With regard to that issue, the court directed Cooper to file an adversary proceeding to
11  seek declaratory relief regarding the effect of the prior bankruptcy, and modification of
12  the loan documents if appropriate.

13      Cooper filed the related complaint seeking declaratory relief which incorporates by
14  reference the pleadings in the Claim Objection, but does not otherwise allege any specific
15  facts upon which relief could be granted (the "Adversary Proceeding").  Watson filed a
16  responsive pleading in which she agreed to amend her claim to a lower amount based on a
17  stipulated payment history the parties had entered into after the Claim Objection was
18  filed.  By the time the Adversary Proceeding was filed, the parties had completed
19  discovery of the Claim Objection and were prepared for trial on all issues, including the
20  "debt forgiveness " issue.  Accordingly, the court ordered that the Claim Objection and
21  the Adversary Proceeding be consolidated for trial.  The matters have now been tried
22  before the court.

23  **Background and Findings of Fact.**

24      Cooper is by trade a self-employed carpenter and cabinet maker.  When the
25  relevant events here began, he lived in Gardena, California.  In 1996, he purchased from
26  Watson's father, James S. Moore ("Moore"), a 60-acre parcel of ranch property in
27  _____
28  23.

Caliente, California, which included a mobile home and a small dwelling (the "Ranch Property"). Cooper continued to reside in Gardena for several years, however, the Ranch Property is now his primary residence. To finance the purchase, Cooper executed two promissory notes in favor of Moore, both were dated January 31, 1996. The first promissory note, in the amount of $30,000, was soon paid off and after some delay, the deed of trust for that obligation was reconveyed; the $30,000 note is not at issue here.

The second promissory note was made in the amount of $105,000. (Trial Ex. 2, Aug. 1, 2013) It provided for interest at the rate of 8% per annum and monthly payments in the amount of $1,003.45 to begin on April 12, 1996 "and continuing until paid" (the "Moore Note" or "Note"). Cooper made those payments by depositing them into Moore's bank account. Pursuant to the terms of the Note, each payment was applied first to accrued and unpaid interest for the current and prior months. The holder of the Note had the option to accelerate and declare the entire balance due upon default. The Moore Note was secured by a deed of trust against the Ranch Property which was also dated January 31, 1996, and recorded shortly thereafter. James Moore died in September 1999. However, Cooper did not learn of his death until about two months later. Cooper did not learn that Watson was the holder of the Note until some time after that.

**The Foreclosure and the 1998 Bankruptcy.** Cooper purchased the Ranch Property because, *inter alia*, he wanted to start a commercial chicken business. However, his plans were met with some opposition from the neighboring land owners and Cooper was never able to get the permits required to start the business. For various reasons, Cooper began to miss payments to Moore on the Note. In June 1998, a Notice of Default and Election to Sell was recorded (presumably by Moore) to commence a foreclosure proceeding against the Ranch Property. A Notice of Trustee's Sale was recorded in September 1998, and the foreclosure was set to take place on October 21, 1998. (Trial Ex. C, Aug. 1, 2013)

Two days prior to the foreclosure, on October 19, 1998, Cooper filed a petition for relief under chapter 13 in the U.S. Bankruptcy Court for the Central District of California

4

(Trial Ex. 3, Aug. 1, 2013; Case No. 2:98-bk-52280-VK; the "Prior Bankruptcy").  At
that time, Cooper still resided in Gardena, California.  After three unsuccessful attempts
to confirm a chapter 13 plan, Cooper filed his third amended plan on October 13, 1999
(Trial Ex. 14, Aug. 1, 2013; the "1999 Plan").  The 1999 Plan appears to be a standard
form plan used at that time in the Central District.  It listed Cooper's obligation to Moore
in Class 2 as a claim secured by real property that is the Debtor's principal residence.  By
that time James Moore had passed away, but nothing had yet been filed in the Prior
Bankruptcy regarding a designated successor.

The record in this case does not show that Moore filed a proof of claim in the Prior
Bankruptcy.  Likewise, the record is silent as to the amount then owed and the arrearage
on the Moore Note.  However, the 1999 Plan stated that arrearage to be in the amount of
$13,970.25 and provided for monthly payments to cure the arrearage in the amount of
$437.80 for a term of 36 months.  The ongoing postpetition payments against the Moore
Note were not provided for in the 1999 Plan and were therefore to be paid directly by
Cooper as they came due.  The 1999 Plan was confirmed without objection from Moore's
representative.  Watson first appeared in the Prior Bankruptcy in October 2000.[3]

**The Stay Relief Motion and Settlement.**  On March 18, 2004, Watson filed a
motion for relief from the automatic stay which Cooper opposed (Trial Ex. 4 & 5, Aug. 1,
2013; the "Motion for Relief").  The Motion for Relief was based on Watson's contention
that Cooper had failed to make payments due under the Moore Note.  Watson's
declaration filed in support of the Motion stated a "principal balance" in the original
amount of the Moore Note, $105,000.  It also stated "accrued prepetition payment
arrearages" in the amount of $31,106.95 (31 payments) and "accrued post-petition

---

[3] The 1999 Plan was filed soon after Moore's death and the record does not show that
Watson even knew about the Prior Bankruptcy at the time the 1999 Plan was confirmed.  On
October 23, 2000, Watson filed a request for special notice on behalf of the James S. Moore
Family Trust.  Thereafter Watson, as trustee, succeeded Moore as the creditor holding the Moore
Note.

5

payment arrearages" in the amount of $54,186. 30 (54 payments). Watson also included a claim for her attorney's fees in the amount of $7,600 and calculated a "Total claim as of March12, 2014" in the amount of $92,893.25 (the "Stay Relief Claim").

In response to the Motion for Relief, Cooper disputed Watson's contention regarding a prepetition arrearage; he filed a declaration stating that he had made all of the payments required under the 1999 Plan. (Trial Ex. 5, Aug. 1, 2013.) With regard to the postpetition payment arrearage, Cooper acknowledged that some number of postpetition payments had not been made since Moore's death. Cooper argued that after Moore died, the bank account where Cooper had been depositing the Note payments was closed. After learning of Moore's death in November 1999, he attempted to contact Moore's home and neighbors to find out, unsuccessfully, where to send the Note payments. Accordingly, Cooper prayed for denial the Stay Relief Motion, "because of the circumstances regarding the death of Mr. Moore and not receiving any notice of where to send payments."[4]

The Stay Relief Motion was set for hearing on May 4, 2004, and ultimately resolved by way of a stipulated agreement. The record is silent regarding the discovery (if any) and negotiations that took place in preparation for the hearing. However, at that time the parties entered an oral stipulation on the record which provided for the resumption of "regular payments" and three additional $10,000 payments to "clear up the arrearage under the promissory note" (Trial Ex. 7, Aug. 1, 2013; the "Stay Relief Settlement"). Watson's attorney, Brenda Enderle, Esq., and Cooper's attorney, J. Arthur Bernal, Esq., made the following representation before Judge Bufford to memorialize the Stay Relief Settlement:

/ / /

/ / /

/ / /

---

[4] Watson's attorney filed a declaration in reply which raised factual issues regarding Watson's efforts to contact Cooper and Cooper's efforts to make payments on the Moore Note. That declaration was not admitted into evidence.

Ms. Enderle:  We have come to an agreement that Mr. Cooper will pay on the promissory note $10,000 before May 14th *and beginning regular payments starting June 1st* with an additional $10,000 payment toward the arrearage on the promissory note by December 31st, and then by May 14th of 2005 *an additional $10,000 will clear up the arrearage under the promissory note.*

Mr. Bernal:  That's correct, your Honor.

Trial Ex. 7, Aug. 1, 2013 (emphasis added).

Thereafter, the docket shows that the Motion for Relief was settled by a stipulation for adequate protection.  No formal stipulation or agreement was prepared, and no order was entered to memorialize the terms of the Stay Relief Settlement beyond the oral statements above.  The record shows that Cooper made the first two $10,000 payments in May 2004 and January 2005, respectively.  (Trial Ex. 1, Aug. 1, 2013.)  However, he only paid half of the third payment in June 2005.  Cooper was unable to produce any record to show that the remaining $5,000 of the Stay Relief Settlement was ever paid.

Cooper contends that he made all of the prepetition arrearage payments to the trustee that were required under the 1999 Plan.  The trustee in the Prior Bankruptcy filed her final report and account in December 2005.  The trustee's final report showed that $13,970.25 of principal and $1,552.10 of interest had been paid by the trustee on account of the "arrearage" as stated in the 1999 Plan.  The report does not show the amounts and dates of the payments actually made on account of the Moore Note.[5]  Thereafter, Cooper received his discharge in January 2006 and the Prior Bankruptcy was closed the following November.  (Trial Ex. 9, Aug. 1, 2013.)

**The 2009 and 2010 Bankruptcies and the State Court Litigation.**  Cooper filed a second bankruptcy case in December 2009, also in the Central District of California (Case No. 2:09-bk-44785-EC).  While that case was still pending, Cooper filed a third bankruptcy case in March 2010, again, in the Central District (Case No. 2:10-bk-19895-

---

[5] It is unknown where the trustee sent the Plan payments after Moore's death or when the trustee learned of a new address for these payments.

1  VZ).  However, both cases were dismissed shortly thereafter.[6]  The record is silent

2  regarding the reason for these bankruptcy filings; however, the payment history shows

3  that Cooper had again starting missing payments on the Moore Note as early as July 2005.

4  He had failed to make numerous payments on the Note during the months before and after

5  these bankruptcies were filed.

6      In August 2011, Watson recorded a Notice of Default and Election to Sell Under

7  Deed of Trust to commence another foreclosure against the Ranch Property.  (Trial Ex. D,

8  Aug. 1, 2013.)  That document stated a balance then due on the Moore Note in the

9  amount of $72,548.96 plus accrued but unpaid interest.  The record does not show that a

10  foreclosure sale was actually set; however, Cooper filed a civil lawsuit against Watson in

11  the Kern County Superior Court on March 14, 2012.  (Trial Ex M, Aug. 1, 2013; Case

12  No. S-1500-CV-276127 NFT; the "Civil Action").  Through the Civil Action, Cooper

13  sought declaratory and injunctive relief to prevent Watson's foreclosure.  The complaint

14  filed in the Civil Action raised essentially the same issues now before this court, however,

15  Cooper pled that he only owed some amount between "$17,058.65 to $22,058.54 as of

16  August 31, 2011."  (Trial Ex. M, pg. 3 & pg. 8, Aug. 1, 2013.)  Before a trial could be set,

17  on June 6, 2012, Cooper requested dismissal of the Civil Action because, in his attorney's

18  words, Cooper was unable to deposit with the court the amount of arrearage which he had

19  acknowledged in the complaint.  (Trial Tr. 99:7-14, Aug. 1, 2013.)

20      **The 2012 Bankruptcy and the Chapter 13 Plan.**  Soon after the Civil Action

21  was dismissed, Cooper filed this bankruptcy proceeding in the Eastern District of

22  California on September 10, 2012.  Michael H. Meyer, Esq., was appointed the chapter 13

23  trustee (the "Trustee").  Watson timely filed a secured claim in the amount of

24

25

26
   _____

27      [6] The 2009 case was dismissed in April 2010 due to Cooper's failure to make plan
   payments to the chapter 13 trustee.  The 2010 case was dismissed in April 2010 due to Cooper's

28  failure to file schedules and statements.

8

$116,103,58 (the "Watson Claim").[7]  Watson's claim stated that the entire outstanding balance was due and in arrears.

Cooper's first modified chapter 13 plan was filed in January 2013, and confirmed on October 25, 2013 (the "2013 Plan").  The 2013 Plan commits Cooper to pay the Trustee $951 per month for a term of 60 months.  Watson's Claim is provided for in Class 1 as a "delinquent secured claim that matures after completion of this plan."  Postpetition payments on Class 1 claims must be paid through the Trustee and cannot be modified through the 2013 Plan.  The 2013 Plan acknowledges an estimated arrearage of $16,000 to be paid over the term of the Plan with a monthly "arrearage dividend" in the amount of $267.  It also provides for monthly postpetition payments in the amount of $213, which is substantially less than the monthly payment called for in the Moore Note ($1,003.45). Finally, the 2013 Plan, as originally filed, included an "additional provision" which purported to modify Watson's Claim by reducing the contract installments to $213 per month "beyond the five year term of the plan until the claim is paid in full."  It also purported to fix the principal balance of the Claim at $20,000, to be amortized over a term of ten years with interest at the rate of 5% per annum.

The 2013 Plan initially drew an objection from the Trustee relating to the payment of attorney's fees.  That issued was subsequently resolved and withdrawn.  Watson did not file an objection to confirmation of the 2013 Plan and the court published a pre-hearing disposition to grant Cooper's motion and confirm the 2013 Plan on April 2, 2013. Cooper's Claim Objection was filed on February 15, 2013, and was set for hearing at the same time as the 2013 Plan confirmation hearing.  Watson did oppose the Claim Objection and it was subsequently set for an evidentiary hearing along with the Adversary Proceeding.

The Trustee did not formally object to the Class 1 treatment of Watson's Claim,

---

[7] Watson amended her proof of claim on October 30, 2012, and again on March 5, 2013. The stated balance in the amended claims did not change and for purposes of those proceedings, the amendments were immaterial.

9

however it is clear that some negotiations took place off the record. When the Trustee submitted the confirmation order for the 2013 Plan, which was approved by Cooper's attorney, it contained a term which struck the "additional provision" of the 2013 Plan. The court interlineated another provision in the confirmation order which limited the 2013 Plan's effect on the Watson Claim: "Notwithstanding anything in the plan, the amount of the class 1 claim of Kathy Watson, Trustee, and the arrearage on the claim, will be fixed in the contested matters currently under submission."

### Cooper's Payment History, Watson's Proof of Claim, and the Stipulation.

Cooper objects to Watson's Claim based, *inter alia*, on his contention that Watson failed to account for all of the payments he had made. Attached to the Watson Claim are copies of the Moore Note and the related deed of trust. The Watson Claim also includes a list, presumably based on records then available to Watson, of all payments made against the Moore Note from the date of the Note, January 31, 1996, to October 4, 2012 (the "Watson Accounting").[8] Watson's Accounting shows that Cooper began making payments on April 12, 1996, as required by the terms of the Moore Note. However, he began missing some payments as soon as September 1996. As time passed, the "gap" between monthly payments increased, and with accrued interest, the payments he did make were not always enough to reduce the principal. According to Watson's records, one payment was missed in 1996, four were missed in 1997, nine in 1998, and five in 1999. One large payment in the amount of $7,797.60 was made for all of the year 2000. No payments were reported for 2001, 2002, and 2003. Payments resumed with some regularity in May 2004, however, four more payments were missed in 2005, two were missed in 2006, two in 2007, five in 2008, and seven in 2009; only one payment in the amount of $3,010.35 was received for 2010, and the last two were received in March and April 2011. Thereafter, interest continued to accrue at the rate of $643.33 per month until this bankruptcy was

---

[8] Watson apparently did not have a record of the payments that had been made in the Prior Bankruptcy through the chapter 13 trustee because none of those payments are reflected in her Accounting.

10

1   filed in September 2012. Even after the Stay Relief Settlement was announced in the

2   Prior Bankruptcy, in May 2004, Cooper continued to make irregular payments in the

3   amount as originally required in the Moore Note, $1,003.45. At no time did Cooper

4   reduce his monthly payments to the amount which the 2013 Plan purported to fix as the

5   new postpetition payment ($213).

6           During pre-trial proceedings, the court directed the parties to meet and confer and

7   try to agree upon which payments had and had not been made, which were undisputed

8   and which were in need of a resolution by evidentiary hearing. Both Cooper and his

9   attorney attended and participated in that meeting on May 29, 2013. They shared

10   documents and records, and generated a document entitled "Joint Statement of Issues in

11   Dispute and Agreement" which was signed by both attorneys and filed herein on May 30,

12   2013 (docket no. 78 - the "Stipulation"). Based on that meeting, and the documents

13   produced during the meeting, Watson essentially gave Cooper credit for a number of

14   payments that were not included in her initial Accounting.[9]

15           At trial, Watson introduced the expert testimony of Michael Wright, a licensed

16   certified public accountant, who had prepared an accounting using the dates and payments

17   set forth in the Stipulation.[10] Based on Mr. Wright's analysis, Watson again agreed to

18   reduce her Claim from $116,103.58 to $92,484.49. The court will deem the Stipulation

19   and the testimony of Mr. Wright to be an amendment of the Watson Claim. Cooper now

20   contends that he made additional payments, which were not documented during the May

21   29 meeting with the attorneys, and that the payment history set forth in the Stipulation is

22   incomplete.

---

24         [9] The revised accounting included in the Stipulation included numerous small payments

25   between December 2009 and June 2002. Presumably, these are the chapter 13 plan payments

26   from the Prior Bankruptcy which were not included in the original Watson Accounting.

27         [10] Based on Cooper's objection relating to the timeless of Mr. Wright's accounting, the

court did not admit the actual written accounting prepared by Mr. Wright into evidence.

28   However, Mr. Wright was permitted to testify as to his methods and conclusion.

**Issues Presented.**  Cooper raises two issues.  First, he contends that his obligation under the Moore Note was partially forgiven by the terms of the Stay Relief Settlement in the Prior Bankruptcy.  He contends that the phrase "will clear up the arrearage under the promissory note" memorialized an agreement with Watson whereby the entire postpetition arrearage (stated by Watson in the Stay Relief Motion to be $54,186.30) was reduced to $30,000.  In other words, Cooper contends that effective May 4, 2009 (the date of the hearing on the State Relief Motion), Watson agreed to forgive $24,186.30 of the balance due on the Moore Note.  Watson, in turn, contends that the Stay Relief Settlement was not an enforceable contract to modify or partially forgive Cooper's obligation under the Moore Note.

Cooper also offers an accounting, prepared by his expert witness Jerry Kemp, of the payments that he contends were made against the Moore Note and a calculation of the balance still due.  (Trial Ex. 12, Aug. 1, 2013.)  Cooper's calculation begins in May 2004 with a starting balance of $93,225.17, and is based on his contention that $30,000 of that sum was fixed as the arrearage through the Stay Relief Settlement.[11]  Cooper's accounting concludes that only $36,958 was owed to Watson just prior to commencement of this case.  Needless to say, Cooper's accounting is radically different than the accounting offered by Watson, as modified at trial, which is based on the Stipulation and which tracks the payments received since commencement of the obligation in 1996.  (*See* footnote 1, *supra*.)  As a secondary issue, Cooper contends that the Stipulation and Watson's accounting fails to give him credit for several payments which were made, but for which he has no supporting documentation.

---

[11] Cooper relies upon an amortization schedule prepared by Chicago Title Company which was included in the exhibits (Trial Ex. 13, Aug. 1, 2013) but was not admitted into evidence.  That amortization schedule begins with the assumption that Cooper had timely made all of the payments due on the Moore Note, which we know from the Stipulation did not happen.  Had he done so, according to the amortization schedule, the balance due on the Note in May 2004 would have been $63,225.17.  To that, Cooper added the $30,000 "arrearage" purportedly agreed to in the Stay Relief Settlement to arrive at a May 2004 "starting balance" of $93,225.17.

12

The first issue which the court must resolve is the question of whether Cooper's obligation under the Moore Note was somehow modified or partially forgiven in the Stay Relief Settlement. Once that is determined, the court must decide which accounting best reflects the unpaid principal and accrued interest due on the Moore Note at the commencement of this bankruptcy. It is clear from the record that neither party has a complete set of records regarding the payment history against the Moore Note and that an exact determination of Watson's Claim will therefore be impossible to achieve.

**Analysis and Conclusions of Law.**

**Applicable Law Regarding Proofs of Claim.** A proof of claim is deemed allowed unless a party in interest objects pursuant to § 502(a). A properly filed proof of claim constitutes "prima facie evidence of the validity and amount of the claim" pursuant to Federal Rule of Bankruptcy Procedure 3001(f). When a party objects to a claim, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the courts have "put in place a general procedure to allocate the burdens of proof and persuasion in determining whether a claim is allowable." *Lundell v. Anchor Construction Specialists* (*In re Lundell*), 223 F.3d 1035, 1039 (9th Cir. 2000). The relative burdens for production of evidence and persuasion are explained in *Lundell* at 1039 as follows:

> Upon objection, the proof of claim provides "some evidence as to its validity and amount" and is "strong enough to carry over a mere formal objection without more." To defeat the claim, the objector must come forward with sufficient evidence and "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves."
>
> If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. (citations omitted). The ultimate burden of persuasion remains at all times upon the claimant.

*Id.*, citations omitted.

Upon review of Watson's Claim, it appears that the Claim is complete and entitled to the presumption of validity under Rule 3001(f). Cooper therefore has the burden of producing evidence to show that the Watson Claim was improperly calculated.

13

**The Moore Note and the Prior Bankruptcy.**    The threshold issue which must be
addressed is:  What was Cooper's obligation under the Moore Note and what effect did
the Stay Relief Settlement in the Prior Bankruptcy have on that obligation?  Watson
stepped into the Prior Bankruptcy after the death of her father and after some period of
time undertook efforts to enforce the Moore Note.  The declaration she lodged in support
of the Stay Relief Motion appears to have been incorrect, at least with regard to the
prepetition arrearages that Cooper was paying through the 1999 Plan.  If Watson did not
then have good records with regard to payment of the prepetition arrearages, it is safe to
infer that she did not have complete records with regard to the postpetition payments,
many of which were either paid to her father or not paid after his death.  Since we do not
have anything filed by Mr. Moore to show what was owed at the commencement of the
1998 Bankruptcy, neither is it possible to state with accuracy what was owed when
Watson filed the Stay Relief Motion.

      Cooper argues that Watson made an "admission" in the Stay Relief Motion that her
Claim at that time was only $92,893.25, the above-referenced Stay Relief Claim.
However, Cooper misinterprets the information filed in support of the Stay Relief Motion.
The number provided in paragraph 6, line f, of the Stay Relief Motion (Trial Ex. 4, pg. 5,
Aug. 1, 2013), is a calculation of the pre and postpetition arrearages, plus the attorney's
fees; it is not a statement of the total principal and accrued interest then owing on the
Moore Note.  The Stay Relief Motion erroneously states the "principal" portion to be
$105,000, however, we know from the payment history that the principal balance of the
Moore Note had been partially paid down by the time the Stay Relief Motion was filed.
The court therefore cannot use the Stay Relief Claim as a starting point for calculating the
balance owed at the commencement of this case.

      As late as the meeting between the attorneys in May 2013, Watson accepted
documents from Cooper reflecting payments that she did not have in her records and
based thereon has stipulated to reduce her Claim by more than $23,000.  Cooper's records
were also incomplete.  As late as March 2012, when Cooper filed the Civil Action to

14

1  prevent Watson's foreclosure, he alleged that he only owed some amount between
2  $17,058 and $22,058. Neither of those numbers is reconcilable with his prayer in this
3  proceeding. Even at the trial of this matter, Cooper was unable to produce documents to
4  support many of the payments he "remembered" making.

5      Despite the "arrearage" stated in the 1999 Plan, there has never been an
6  adjudication that the 1999 Plan was accurate. Nevertheless, Cooper contends that he
7  cured the prepetition arrearage through the 1999 Plan and that Watson subsequently
8  agreed to partially forgive and reduce the outstanding balance due on the Moore Note by
9  approximately $24,000. Watson responds that the Stay Relief Settlement was simply an
10 agreement to resolve, for that time, a disputed issue regarding relief from the automatic
11 stay and that it was never intended to constitute a partial forgiveness, or effort to fix the
12 balance due on the Moore Note. Based on the brevity and ambiguity of the Stay Relief
13 Settlement, the notable absence of good records, and the subsequent conduct of the
14 parties, the court finds Watson's argument to be more persuasive.

15     "A modification of a contract is a change in the obligations of a party by a
16 subsequent mutual agreement of the parties."[12] *Secrest v. Sec. Nat'l Mortg. Loan Trust*
17 *2002-2*, 167 Cal. App. 4th 544, 553 (2008). A written contract may be modified by a
18 subsequent written or oral agreement. *See* Cal. Civ. Code § 1698. The party seeking to
19 enforce an oral modification of a written contract bears the burden of proving the
20 necessary elements of an oral modification by the preponderance of the evidence. *See*
21 *Barret v. Bank of Am.*, 183 Cal. App. 3d 1362, 1370 (1986).

22     In support of the Stay Relief Motion, Watson filed a declaration stating that
23 postpetition arrearages were then owed in excess of $54,000. Cooper first argues that the
24 parties agreed, through the Stay Relief Settlement, to reduce that number to $30,000.
25 Rather than requiring that Cooper cure the postpetition arrearages of $54,186.30 in full,
26 the Stay Relief Settlement allowed Cooper to make three semiannual payments of

27  

28     [12] Cooper is not arguing that the oral stipulation constituted a novation or an accord.

15

$10,000 each. In essence, Cooper contends that this agreement constituted an enforceable modification of the Moore Note and operated to forgive any remaining postpetition arrearages (approximately $24,000) once the three payments were made. However, Cooper's argument is unpersuasive for two reasons.

**Mutual Consent.** First, the court is not persuaded that there was mutual consent to forgive the sum of $24,000 or to fix the balance then due on the Moore Note. A contract can "be subsequently modified with the assent of the parties thereto, provided the same elements essential to the validity of the original contract are present." *Carlson, Collins, Gordon & Bold v. Banducci*, 257 Cal. App. 2d 212, 223 (1967) (citation omitted). One of these elements is the need for mutual consent by the contracting parties. *See* Cal. Civ. Code §§ 1550, 1565; *Wade v. Diamond A Cattle Co.*, 44 Cal. App. 3d 453, 457 (1975). "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." Cal. Civ. Code § 1580. In other words, "there is no contract until there has been a meeting of the minds on *all* material points." *Banner Entm't v. Superior Court*, 62 Cal. App. 4th 348, 357–58 (1998) (emphasis original). Further, "the failure to reach a meeting of the minds on all material points prevents the formation of a contract even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract." *Id.* at 359 (emphasis omitted).

"Mutual consent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 208 (2006). Mutual consent is a question of fact. *ASP Props. Grp. v. Fard, Inc.*, 133 Cal. App. 4th 1257, 1269 (2005). "If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent and no contract formation." *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998).

Here, the forgiveness of $24,000 would clearly be a material term of the Stay Relief Settlement. Yet, there was no objective evidence to show that the parties mutually

16

agreed to do that.  The only evidence presented on this issue was the transcript from the May 4, 2004, hearing.  However, that evidence is too ambiguous and inconclusive to show what was actually in dispute and what the parties were actually agreeing to. Watson's attorney's brief recitation on the record, that the resumption of regular payments and the addition of three semiannual payments of $10,000 will "clear up the arrearage under the promissory note" does not unambiguously establish that Watson was unconditionally forgiving the balance of the postpetition arrearages.  Indeed, the oral statement on May 4 appears to raise more questions than it answers.  Neither party had complete records of the payment history.  Were the parties agreeing that the postpetition arrearage was only $30,000 or were they agreeing to forgive any arrearage above that number?  If so, what was the actual arrearage from which the reduction would apply?  If the parties were agreeing to fix a new balance owing under the Moore Note, what was that number and what were they starting from? Since the Stipulation came in the context of a contested motion for relief from stay, the more logical explanation would be that Watson would suspend her quest to foreclose on the Ranch Property so long as Cooper resumed regular Note payments and paid the additional $30,000.  If Cooper intended the Stay Relief Settlement to mean more than that, why didn't Cooper's attorney make any effort to supplement the record with more details?  Notably, absent from the record is any specific statement as to the "debt forgiveness" issue.  Nothing in the record suggests what the new balance owing on the Moore Note would be and certainly nothing was agreed to with regard to a reduction of the monthly payments.  Indeed, Cooper continued to make irregular payments to Watson in the original amount.

**The Absence of Performance and Consideration.**  Even assuming that there was initially a meeting of the minds with regard to the modification and partial forgiveness of debt, that agreement would be unenforceable under applicable law based on the lack of performance and consideration. As § 1698 of the California Civil Code provides, a subsequent oral agreement may modify a written contract only under certain circumstances:

17

(b) A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties.

(c) Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration. The statute of frauds (Section 1624) is required to be satisfied if the contract as modified is within its provisions.

Cal. Civ. Code §§ 1698(b) & (c).

Thus, a party can generally enforce an oral modification of a written contract when that oral modification has been executed or supported by new consideration.[13] However, Cooper has not established that the Stay Relief Settlement meets either of these additional requirements.

The term "'Executed' in [California Civil Code] § 1698(b) has the normal meaning of that term in contract law. That is, the agreement must have been fully performed." *Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d 1075, 1081 (9th Cir. 2005); *accord* Cal. Civ. Code § 1661 ("An executed contract is one, the object of which is fully performed. All others are executory."). Here, Cooper did not fully perform under the Stay Relief Settlement. He did not thereafter make regular monthly payments due under the Moore Note (as evidenced by the payment history and the subsequent foreclosure action commenced by Watson) and he did not pay in full the third and final cure payment, having only paid $5,000 of the required $10,000.

In addition, Watson received no consideration for the debt forgiveness. A "supplemental agreement either adding to or varying the terms of the original contract, so as to impose new and onerous burdens upon one of the parties, requires a consideration to support it." *Krobitzsch v. Middleton*, 72 Cal. App. 2d 804, 808 (1946). "There must be some consideration flowing from the obligor, either a benefit to the obligee or a detriment

---

[13] Subdivision (c) of California Civil Code § 1698 also requires that the statute of frauds be satisfied if the contract as modified falls within the statute of frauds. *See Secrest*, 167 Cal. App. 4th at 553. A modification of a note and deed of trust is subject to the statute of frauds. *See id.* However, if the statute of frauds is not properly raised, it may be forfeited. *Id.* at 551. Here, Watson has not raised a statute-of-frauds argument. Therefore, the court has no need to consider the issue.

18

to the obligor for which the obligee bargained, before a modification . . . can be found."
*Hunt v. Smyth*, 25 Cal. App. 3d 807, 819 (1972); *see also* Cal. Civ. Code § 1605 (defining
"good consideration"). However, the obligor's performance of what he is already legally
obligated to perform is not sufficient consideration for purposes of a modification.
*Greenamyer Eng'g & Tech., Inc. v. Mediscan Research, Ltd. (In re Mediscan Research,
Ltd.)*, 109 B.R. 392, 395 (9th Cir. BAP 1989), *aff'd*, 940 F.3d 558 (9th Cir. 1991).

Here, Cooper has not shown that Watson received any consideration in exchange
for a substantial forgiveness of debt. *Cf. D.L. Godbey & Sons Constr. Co. v. Deane*, 39
Cal. 2d 429, 432 (1952) (noting that "executed agreements that might otherwise [be
unenforceable] for lack of consideration" include "agreements to accept less than is due
under the terms of a written contract"). Under the Stay Relief Settlement, Cooper
promised to make three payments totaling $30,000. However, that cannot be considered
new consideration because Cooper was already obligated to pay substantially a greater
amount under the Moore Note. *See Stroud v. Thomas*, 139 Cal. 274, 276 (1903) ("[T]he
payment of money on the obligation already existing and past due . . . merely satisfie[s] to
that extent the debt due, and [does] not constitute a consideration for the [new]
agreement.").

Based on the foregoing, the court is not persuaded that the Stay Relief Settlement
in the Prior Bankruptcy was anything more than an agreement by Watson to withdraw her
Stay Relief Motion and not pursue the pending foreclosure against the Ranch Property.
Indeed, that is exactly what Watson did. She ceased prosecution of the Stay Relief
Motion and took no further action to enforce the Moore Note until 2011 when she started
a new foreclosure proceeding. The Stay Relief Settlement did not operate to forgive
$24,000 of the outstanding balance due on the Moore Note and it certainly was not
effective to fix a new balance going forward.

**Calculation of Watson's Claim: Evidentiary Effect of the Stipulation.** The
court has now determined that Cooper's obligation under the Moore Note was not
modified or partially forgiven in the Prior Bankruptcy. The final task is to decide which

19

accounting offered by the parties best reflects the balance due on the obligation at the commencement of this bankruptcy. The accounting offered by Cooper is premised on two assumptions: (1) that the underlying obligation was partially forgiven; and (2) that a new balance of $93,225.17 was implicitly fixed by agreement of the parties in May 2004. First, Cooper offers no admissible evidence to support a finding with regard to the $93,225.17 number. (*See* footnote 10, *supra*.) Second, the court cannot make a finding that any debt was forgiven by Watson. Even if the court were to consider the debt forgiveness, there is no admissible evidence as to what number that adjustment should apply to. The court must therefore reject Cooper's accounting.

Watson's accounting, in turn, is based on the payment history reflected in the Stipulation and the analysis of Watson's expert witness.[14] At trial, Cooper testified that the Stipulation signed by his counsel fails to include a number of payments for which he had no supporting documents. However, the court is bound here to apply the information contained in the Stipulation and cannot accept Cooper's conflicting testimony.[15]

Cooper contends, *inter alia*, that Watson failed to account for a large number of payments made on the underlying promissory note after the death of Mr. Moore. However, that issue appears to have been resolved by the parties in the Stipulation. Cooper is, in essence, asking the court to ignore the Stipulation and consider new evidence not offered or considered during the May 29 meeting, regarding the number of payments for which he should be given credit. "Stipulations are entered into in order to dispense with proof over matters not in issue, thereby judicial economy at the convenience of the parties." *United States v. McGregor*, 529 F.2d 928, 931 (9th Cir. 1976). As the Supreme Court has recently stated, "Litigants, we have long recognized,

---

[14] Both parties introduced testimony from qualified expert witnesses. Both experts used a well recognized software program to analyze the stream of payment information they had been given by their clients and arrive at a conclusion regarding the balance owed on the Moore Note.

[15] The court notes that Cooper did not move to vacate the Stipulation after it was filed or at any time prior to trial.

'[a]re entitled to have [their] case tried upon the assumption that . . . facts, stipulated into the record, were established.'" *Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2983 (2010) (alterations in original) (quoting *H. Hackfeld & Co. v. United States*, 197 U.S. 442, 447 (1905)). Such "factual stipulations are 'formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, a judicial admission . . . is conclusive in the case.'" *Id.* (quoting 2 Kenneth S. Broun, McCormick on Evidence § 254, at 181 (6th ed. 2006)). As a result, "[o]nce a stipulation of fact is made, the one party need offer no evidence to provide it and the other is not allowed to disprove it." *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 889 (D.C. Cir. 2010).

Even if the court could consider Cooper's conflicting testimony regarding additional unapplied payments, the court found that testimony to be profoundly unreliable. As the trier of fact, the bankruptcy court is entitled to evaluate a witness's credibility and to determine whether to believe the testimony or not. *Beauchamp v. Hoose (In re Beauchamp)*, 236 B.R. 727, 731 (9th Cir. BAP 1999), *aff'd mem.* 5 F. App'x 743 (9th Cir. 2001). "When the testimony of a witness is not believed, [the bankruptcy court, as] the trier of fact[,] may simply disregard it." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984).

Here, Cooper had a very clear memory as to what he had actually paid many, many years ago on the Moore Note (even without any documentary evidence of such payments). During trial, Cooper made the following statements: (1) he remembered making all 9 monthly payments in 1996, rather than the stipulated 8 (Trial Tr. 69:9–16, Aug. 1, 2013); (2) he remembered making all 12 monthly payments in 2005, rather than the stipulated 10 (Trial Tr. 72:21–73:10, Aug. 1, 2013); and (3) he remembered making either 11 or 12 monthly payments in 2007, rather than the stipulated 10 (Trial Tr. 73:21–74:3, Aug. 1, 2013). At the same time, Cooper had difficulty remembering other seemingly more significant events, such as whether any foreclosures were pending when he filed his previous bankruptcies. For example, when asked about the numerous bankruptcy filings

21

1   (in 1998, 2009, 2010, and 2012) and whether the Ranch Property was the subject of a

2   foreclosure proceeding, Cooper could not give a definitive response, answering, "Not . . .

3   I don't recall that exactly. But probably yes." (Trial Tr. 76:14-17, Aug. 1, 2013.)

4   Additionally, Cooper was vague and uncertain as to the document that was filed to

5   commence this bankruptcy case (Trial Tr. 76: 18-77:14, Aug. 1, 2013), and he did not

6   recall what he had alleged in the Civil Action regarding the balance due on the Moore

7   Note. (Trial Tr. 88:8-17, Aug. 1, 2013.) Because Cooper has exhibited a selective

8   memory, where he clearly remembers every payment against the Note since 1996, while

9   failing to recall other more recent and seemingly important facts, the court cannot find

10  Cooper's testimony to be credible or reliable on the payment history issue.

11  **Conclusion.**

12      Based on the foregoing, the court is not persuaded that Watson agreed to modify or

13  partially forgive any of Cooper's obligation under the Moore Note during the Prior

14  Bankruptcy. In addition, the court is persuaded that Watson's accounting as modified by

15  the Stipulation of the parties, and the testimony of Watson's expert witness, more

16  accurately reflects the payments that were made by Cooper for application to the Moore

17  Note and the balance owing on the Moore Note at the commencement of this case.

18  Accordingly, judgment will be entered for Watson in the Adversary Proceeding.

19  Cooper's Claim Objection will be overruled and Watson's Claim, reflecting the balance

20  due at the commencement of this case, will be allowed in the amount of $92,484.49. The

21  parties shall bear their own costs and attorney's fees.

22      Dated: February ___18___, 2014

23

24

25                                          W. Richard Lee
                                            United States Bankruptcy Judge
26

27

28

22

1

2

3

4 **Instructions to Clerk of Court**
**Service List - Not Part of Order/Judgment**

5

6        The Clerk of Court is instructed to send the Order/Judgment or other court generated
document transmitted herewith to the parties below.  The Clerk of Court will send the Order via
7 the BNC or, if checked_____, via the U.S. mail.

8        Debtor(s), Attorney for the Debtor(s), Bankruptcy Trustee (if appointed in the case), and _
  X__ Other Persons Specified Below:
9

10 Andrew K. Sheffield, Esq.
   5001 E. Commercenter Drive, Suite 300
11 P.O. Box 12092
   Bakersfield, CA 93389-2902
12
   Office of the U.S. Trustee
13 U.S. Courthouse
   2500 Tulare Street, Suite 1401
14 Fresno, CA 93721

15

16

17

18

19

20

21

22

23

24

25

26

27

28